Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| ROBERTO CARROCCIA<br><br>Demandante - Apelante<br><br>v.<br><br>GUILLERMO JOSÉ DE PEDRO MONTES, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA CON GARDILÚ TORRES BLONDET; MYRNA ROMERO EN SU CARÁCTER OFICIAL COMO PRESIDENTA DE LA JUNTA DEL CONDOMINIO VILLAS DE PARKVILLE II, Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA CON JOHN DOE; CONSEJO DE TITULARES CONDOMINIO VILLAS DE PARKVILLE II; JUNTA DE DIRECTORES DE CONDOMINIO VILLAS DE PARKVILLE II; SUN WEST MORTGAGE COMPANY, INC.; ERICA MARIEL GARCÍA RODRÍGUEZ POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA CON JUAN DEL PUEBLO; FULANO DE TAL, FULANA DE TAL, JUANA DEL CAMPO, ASEGURADORA ABC, COMPAÑÍA XYZ<br><br>Demandados – Apelados | TA2025AP00439<br><br>consolidado<br>con<br><br>TA2025AP00494 | Apelación procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Civil núm.: GB2023CV00808 (507)<br><br>Sobre:<br>Acción Civil |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de diciembre de 2025.

El Tribunal de Primera Instancia ("TPI") desestimó por la vía sumaria unas reclamaciones, por supuesta omisión dolosa de información, presentadas en contra del vendedor de un apartamento

y una corredora de bienes raíces.  Según se explica en detalle a continuación, concluimos que actuó correctamente el TPI, pues el reclamante no controvirtió la prueba sometida por los demandados a los efectos de que estos no tenían información material, no divulgada al demandante, sobre unos problemas estructurales y de suelo del complejo residencial, antes de la transacción de compraventa del apartamento comprado por el demandante.

I.

En septiembre de 2023, el Sr. Roberto Carroccia (el "Demandante", el "Comprador" o el "Apelante") presentó la acción de referencia, sobre acción resolutoria, daños por vicios de construcción, impericia profesional, recisión de contrato, y daños y perjuicios por causa de dolo (la "Demanda"), en contra, en lo pertinente, del Sr. Guillermo J. De Pedro Montes (el "Vendedor"), su esposa, la Sa. Gardilú Torres Blondet (ambos, los "Vendedores"), y la Sa. Érica Mariel García Rodríguez, corredora de bienes raíces (la "Corredora").

El señor Carroccia alegó que, el **29 de agosto de 2022**, compró el apartamento EK-PH1 (el "Apartamento") en el Condominio Villas de Parkville (el "Condominio"), y que este resultó afectado por un derrumbe del muro de retención, ocurrido el 17 de septiembre de 2022, con lo cual se agravó un socavón en los predios del Condominio.  Explicó que el derrumbe destruyó las líneas de agua y alcantarillado, y que el edificio donde ubica su Apartamento tuvo que ser desalojado.  Aseveró que no fue sino hasta que una agencia gubernamental ordenó dicho desalojo que advino en conocimiento de unos problemas estructurales que le fueron "dolosamente" ocultados.  Afirmó que, de haber conocido los problemas estructurales, no hubiese comprado el Apartamento.

El Apelante sostuvo que los demandados tenían una Carta Técnica (la "Carta Técnica"), desde el 8 de **marzo de 2022**,

elaborada por los ingenieros de la firma SPEC Group, LLC, en la que se enumeraron los problemas estructurales y de suelo del Condominio y áreas aledañas, además de las recomendaciones para mitigarlos.

En cuanto a los Vendedores, el señor Carroccia alegó que incurrieron en dolo grave al guardar silencio durante el proceso de compraventa en torno a los problemas estructurales del Apartamento. El señor Carroccia le imputó conocimiento de la Carta Técnica al Vendedor por haber sido el vicepresidente de la Junta de Directores del Condominio (la "Junta").

El Demandante también alegó que la Corredora no veló adecuadamente por sus intereses durante la transacción. El Apelante sostuvo que la Corredora debió tener conocimiento en cuanto a los informes que tenía la Junta sobre los problemas estructurales del Condominio y que le era responsable por no habérselos divulgado.

Luego de varios trámites, el 30 de abril de 2025, el Apelante presentó una *Moción Sometiendo (sic) Informe Pericial*. Informó que había contratado los servicios profesionales de Porticus CSP, del Ing. José M. Izquierdo Encarnación, para la preparación de un informe pericial y que sirviera de perito en el juicio. Junto a la *Moción* presentó el referido informe pericial.

En igual fecha, los Vendedores instaron una *Moción Urgente sobre Desglose de Entrada Número 112 en SUMAC*. Expresaron que el TPI había extendido el descubrimiento de prueba, originalmente pautado para terminar el 28 de febrero, para que el abogado del Apelante le tomara la deposición al Vendedor. Los Vendedores alegaron que fue ese día, 30 de abril, último día concedido para realizar la referida deposición, cuando se les informó por primera vez sobre la presentación de un informe pericial y un perito en el juicio. Subrayaron que el Apelante no informó el nombre de su

perito durante el descubrimiento de prueba y tampoco cursó oportunamente el informe pericial, por lo cual solicitaron el desglose del informe. El 6 de mayo de 2025, los Vendedores incoaron una *Moción In Limine de Prueba Pericial de la Parte Demandante*, en la cual reprodujeron lo anteriormente planteado.

El 9 de mayo, el TPI notificó una *Orden* en la que informó que, luego de extenderse el periodo del descubrimiento de prueba, este se dio por terminado el 30 de abril de 2025. Asimismo, notificó otra *Orden*, mediante la cual acogió la solicitud de los Vendedores y no permitió la presentación del informe pericial del Apelante debido a que no se informó su presentación, ni el nombre del perito, durante el descubrimiento de prueba. El TPI razonó que dicha prueba era sorpresiva y tardía.

El 14 de mayo, el señor Carroccia solicitó reconsideración en cuanto a la exclusión de la prueba pericial, lo cual fue denegado por el TPI el 27 de mayo.

El 30 de mayo, los Vendedores presentaron una *Moción de Sentencia Sumaria* (la "Moción de los Vendedores"). En síntesis, arguyeron que no existía prueba de dolo o de que le ocultaran información al señor Carroccia en cuanto al problema estructural en las áreas comunes del Condominio. Destacaron la ausencia de vicio del consentimiento, toda vez que el Apelante vio los problemas en las áreas comunes del Condominio y fue informado de que profesionales evaluaban la situación. El Vendedor explicó que, desde **febrero de 2022**, había dejado de ser parte de la Junta y, por ende, desconocía el contenido de la Carta Técnica o el Informe del Ing. Lavergne de la firma SPEC. El 2 de junio, los Vendedores suplementaron su moción con una declaración jurada del Vendedor.

Por su parte, el 30 de junio, el señor Carroccia se opuso a la Moción de los Vendedores.

El 15 de julio, la Corredora también interpuso una *Moción de Sentencia Sumaria* (la "Moción de la Corredora"). Sostuvo que no había controversia sobre el hecho de que ella no tenía conocimiento en torno a la condición del terreno antes de la compraventa del Apartamento y que no fue negligente al desconocer la existencia o no tener acceso a los informes sobre la condición del terreno. La Corredora también solicitó que se le impusiera honorarios por temeridad al Apelante. **El Apelante no se opuso a la Moción de la Corredora**.

El 12 de septiembre, el TPI notificó una *Sentencia Parcial* mediante la cual desestimó las reclamaciones contra los Vendedores; se formularon las siguientes determinaciones de hechos:

1. El Sr. Guillermo José De Pedro Montes está casado con la Sra. Gardilú Torres Blondet, bajo el régimen económico de Sociedad Legal de Gananciales.[1]

2. El señor De Pedro Montes era dueño del apartamento EK- PH1 del Condominio Villas de Parkville II.

3. Para el año 2022, el señor Carroccia decidió adquirir una propiedad inmueble en Puerto Rico.

4. El 15 de febrero de 2022, a las 7:00 pm, se celebró en el Condominio Villa de Parkville II una Asamblea Ordinaria.

5. El 16 de marzo de 2022, se preparó un Acta de la referida Asamblea Ordinaria donde presentó a los propietarios el Informe de la Presidenta de la Junta Directiva; Presentación y Aprobación de Informe Financiero Auditado del año 2021; Presentación y Aprobación del presupuesto 2022-2023; y Elección de los Miembros de la Junta.[2]

6. En dicha Asamblea Ordinaria, las siguientes personas brindaron información a los miembros de la Asociación: la Presidenta Marisol Navas, Vicepresidente Guillermo De Pedro, Tesorera Myrna Romero, Representantes de In Servicio LLC, el Sr. Ignacio T Veloz y Sra. Brenda Velázquez y CPA Samuel Loubriel.[3]

7. En la Sección VII titulada Muro de Contención del Acta de la Asamblea Ordinaria surge la siguiente

---

[1] En adelante, se hacen constar las notas al calce en el dictamen original: véase Anejo III, de la Entrada 132; y Entrada 134.
[2] Véase Anejo III, de la Entrada 132; y Entrada 134.
[3] Véase Anejo III, de la Entrada 132; y Entrada 134.

información pertinente a la controversia ante nuestra consideración:[4]

Se explicó lo relacionado al muro y al movimiento de tierra que fue inspeccionado por un Ingeniero Estructural y de suelo, que en algún momento puede ceder el terreno y la importancia en este momento.

La Sra. Magdalena Bonet del apartamento EG1 comentó que envió fotos de grietas encontradas en su edificio hace 8 meses a la Sra. Brenda Velázquez y que no han sido contestadas. Se expone que se llame al broker para investigación y evaluación.

Se comentó que el asfalto del estacionamiento ha comenzado a abrirse.

El Sr. Veloz habló sobre la importancia del informe a ser llevado a cabo por profesionales especialistas en ingeniería estructural y de suelo, entre ellos los ingenieros Pedro Febe, Morla y José Morla. La señora Navas apuntó que tan pronto advino en conocimiento de un hueco reciente en el Área cercana a las escaleras colindantes con VPI, pidió a In Servicio comprar un panel para cubrirlo y aislar el área para evitar accidentes.

8. En la Asamblea Ordinaria se constituyó la nuevo Junta de Directores de la Asociación:[5]

- Sra. Myrna Romero – presidenta
- Sra. María Celeste Rodríguez – secretaria
- Sra. Laurie Pérez – tesorera
- Sra. Ana Laura Vázquez – vocal
- Sra. Matilde Román – vocal

9. Mientras el señor De Pedro fue propietario del apartamento EK-PH1 del Condominio Villas de Parkville II, ocupó puestos en la Junta de Directores del Condominio como Presidente y Vicepresidente hasta el 15 de febrero de 2022.

10. El señor De Pedro no formaba parte de la Junta de Directores del Condominio, a partir del 15 de febrero de 2022.

11. El señor De Pedro fue dueño de la propiedad, Apartamento EK-PH1 del Condominio Villas de Parkville II, desde el 23 de diciembre de 2005 hasta el 29 de agosto de 2022, fecha en que vendió la propiedad al señor Carroccia.

12. Allá para el año 2022, el señor De Pedro Montes contrató al Sr. Rafael Santiago Rodríguez como corredor de bienes raíces y le brindó autorización de venta exclusiva para la venta de la propiedad, localizada en Villas de Parkville II, Apto. EK-PH1, Guaynabo, Puerto Rico 00969.

---

[4] Véase Anejos de la Entrada 132; y Entrada 134.
[5] Véase Anejo III, de la Entrada 132; y Entrada 134.

13. El 16 de enero de 2025, el Sr. Rafael Santiago Rodríguez, prestó una Declaración Jurada, Testimonio núm. 73.[6]

14. El Sr. Rafael Santiago Rodríguez es corredor de bienes raíces, desde el año 2013.[7]

15. El Sr. Rafael Santiago Rodríguez da servicios profesionales de corredor de bienes raíces a la compañía Keller William.[8]

16. Los servicios del señor Santiago Rodríguez consistieron en tomar fotos del apartamento, realizar publicidad, coordinar visitas de varios interesados, mostrar la propiedad a diferentes personas y asistir en el proceso de ofertas y opción de compraventa de la propiedad.[9]

17. En el tiempo que el señor Santiago Rodríguez brindó servicios, el señor de Pedro Montes recibió 3 ofertas para la compraventa de la propiedad.[10]

18. Una de las 3 ofertas para la compraventa de la propiedad fue presentada por el señor Carroccia.[11]

19. El señor Carroccia llegó a la atención del señor Santiago Rodríguez a través de una compañera de trabajo, corredora de bienes raíces, la Sra. Érica Mariel García Rodríguez.[12]

20. Durante el procedimiento de la venta de la propiedad, más de 6 personas fueron a ver la propiedad.[13]

21. El proceso de compraventa de la unidad EK-PH1 del complejo Villas de Parkville II, desde el inicio con el Señor Roberto Carroccia, fue uno cordial y rápido.[14]

22. La Sra. Érica García Rodríguez contactó al señor Santiago Rodríguez y le informó que tenía un cliente interesado en la compra de una propiedad.[15]

23. El señor Carroccia admitió que contactó a su corredora de bienes raíces, la Sra. Érica García Rodríguez y esta fue quien coordinó la visita al apartamento del señor De Pedro Montes, mediante su corredor de bienes raíces, el señor Santiago Rodríguez.[16]

---

[6] Véase Anejo IV, de la Entrada 132; y Entrada 134.
[7] Véase Anejo IV, de la Entrada 132; y Entrada 134.
[8] Véase Anejos de la Entrada 132; y Entrada 134.
[9] Véase Anejos de la Entrada 132; y Entrada 134.
[10] 10 Véase Anejos de la Entrada 132; y Entrada 134.
[11] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[12] Véase pág. 10 de la Entrada 1; Anejos I de la Entrada 132; Entrada 134; Entrada 144.
[13] Véase Anejos Ide la Entrada 132; y Entrada 134.
[14] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[15] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[16] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; y Entrada 144.

24. El señor Santiago Rodríguez coordinó la visita del señor Carroccia para que viera el apartamento del señor De Pedro.[17]

25. El 14 de julio de 2022, fue uno de los días que el señor Carroccia visitó la unidad EK-PH1 del complejo Villas de Parkville II y vio sus áreas comunes el día de la visita. Durante dicho recorrido, se encontraban presentes su corredora de bienes raíces, la Sra. Érica García Rodríguez, como acompañante del señor Carroccia, el señor de Pedro Montes y el señor Santiago Rodríguez.[18]

26. El señor Carroccia visitó en dos ocasiones la unidad EK-PH1 del complejo Villas de Parkville II y vio sus áreas comunes, este declaró que, en una visita, visitó las áreas comunes y en la otra el realtor no tenía las llaves de dichas áreas, por lo que las vio desde el apartamento y desde afuera de las distintas instalaciones que se necesita llave para entrar.[19]

27. Durante las dos o tres visitas del señor Carroccia a la unidad EK-PH1 este pudo ver el apartamento. En una de las visitas pudo tener acceso a todas las áreas comunes del Condominio Villas de Parkville II y podía recorrer la totalidad de las mismas.[20]

28. El 14 de julio de 2022, el señor De Pedro le mostró toda la propiedad al señor Carroccia, incluyendo, sala, comedor, cocina, balcón, cuartos, baños, laundry, terraza donde está la cisterna y transfer switch manual para el generador eléctrico, en caso de emergencia.

29. El 14 de julio de 2022, el señor De Pedro le mostró las áreas comunes del Condominio al señor Carroccia, donde estaban las grietas del complejo y se podía ver a simple vista el estado del Complejo Villas de Parkville II y la Unidad del señor De Pedro.[21]

30. El 14 de julio de 2022, durante el recorrido de la propiedad y de las áreas comunes se le notificó al señor Carroccia que había ocurrido un incidente en parte del terreno cerca del gimnasio, el mismo había sido referido a ingenieros e hidrólogos para que efectuaran una evaluación e informe de hallazgos de dicha situación, mientras recorrían dicha parte de las áreas comunes y este veía los daños sufridos en la propiedad.[22]

31. El señor Carroccia contrató a una inspectora de propiedad para que inspeccionara la unidad EK-PH1

---

[17] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[18] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[19] Véase Entrada 1; Anejos I de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[20] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[21] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[22] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.

del señor De Pedro y la totalidad de las áreas comunes que forman parte del Condominio Villas de Parkville II.[23]

32. El señor De Pedro declaró en su deposición que en el recorrido por el Condominio se le mostró al señor Carroccia las grietas y las cintas amarillas, donde se encontraba el socavón cerca del muro que colinda con la quebrada. El señor Carroccia aceptó que vio grietas en varias partes del complejo y que el señor De Pedro le informó que se había contratado a un experto para evaluar lo que estaba pasando en el área aledaña al gimnasio y muro, pero no recuerda haber visto un socavón.[24]

33. El socavón estaba localizado cuando uno baja para el gimnasio y el señor Carroccia admitió que visitó dicha instalación en una de sus visitas al Condominio Villas de Parkville II.[25]

34. En el recorrido, el señor Carroccia, también, pudo observar, en la pared del muro que colinda con la quebrada, unas grietas y el deslizamiento de las escaleras.[26]

35. Cuando el Sr. Roberto Carroccia observó los daños antes mencionados que tenía el complejo, preguntó sobre ellos y el señor De Pedro Montes contestó que la Junta de Directores del Condominio Villas de Parkville II, había hecho una requisición para consulta a ingenieros e hidrólogos para investigación y arreglo.[27]

36. El señor Santiago Rodríguez declaró que estaba presente cuando el señor De Pedro le explicó al Sr. Roberto Carroccia lo relacionado a los daños, estado de las instalaciones, terreno y grietas que se observó en ese momento en el recorrido del complejo Villas de Parkville II.[28]

37. El señor Santiago Rodríguez indicó que los daños observados por el señor Carroccia se veían a simple vista y todos los que llegaban a ver la propiedad las podían observar.[29]

38. El mismo día que el señor Carroccia visitó la propiedad, se les mostró la propiedad a otras personas interesadas en la compra del apartamento.[30]

---

[23] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[24] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[25] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[26] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[27] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[28] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[29] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[30] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.

39. Al próximo día de haber visto la propiedad, el señor Carroccia, a través de su corredora de bienes raíces, la Sra. Érica García Rodríguez realizó una oferta para la compra del apartamento.

40. Luego de la visita del señor Carroccia, este contrató y envió a un inspector para que realizara una inspección de la propiedad y áreas comunes y recibió el reporte de la unidad EK-PH1 y la totalidad de las áreas comunes que forman parte del Condominio Villas de Parkville II, el 7 de agosto de 2022.[31]

41. Durante la inspección, el señor Santiago Rodríguez estuvo presente.[32]

42. El señor Carroccia admite que contrató los servicios de inspección de la propiedad antes de la compra y que esta rindió un informe.[33]

43. El señor Carroccia encontró que el apartamento del codemandado, De Pedro Montes, cumplía con lo que estaba buscando, en cuanto a número de cuartos, espacio afuera, azotea o jardín.

44. El señor Carroccia estuvo entre dos a tres ocasiones en el Complejo Villas de Parkville II para ver la unidad, las áreas comunes, amenidades, el área de la piscina, los estacionamientos que tenía asignados el apartamento y el área del gimnasio con el realtor y en una ocasión estuvo presente el codemandado, De Pedro Montes.[34]

45. El señor Carroccia no recorrió todo el condominio y las áreas comunes del condominio, porque no le dio importancia a ello y citamos lo declarado por este, en su deposición:

> No le di importancia a lo que era básicamente, la única parte que no vi es lo que daba hacia la calle, hacia el otro lado, esta parte de aquí hacia la calle principal donde está la entrada.
>
> Pero entrando, básicamente lo que yo vi, pónganse donde está la callecita que sube, la mitad, básicamente lo que es la mitad del complejo hacia donde están los apartamentos porque tiene que pasar por allí y entrar. Esta mitad no la vi.[35]

46. El señor Carroccia reconoce que se encontró con el realtor del señor De Pedro Montes y vieron el área de estacionamiento.

---

[31] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.

[32] Véase Anejo IV de la Entrada 132.

[33] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.

[34] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.

[35] Véase págs. 24-25 del Anejo VIII de la Entrada 132.

47. El señor Carroccia logró ver el área del muro de contención del Condominio desde el área de juego de los niños, a algunos metros de distancia.

48. El señor Carroccia admitió que durante la segunda visita al apartamento le preguntó a la señora que le hizo la inspección de la vivienda sobre una grieta que había en el techo y esta le indicó lo que era.

49. De igual manera, el señor Carroccia reconoció que vio unas grietas en el muro, donde están las escaleras en dirección a la piscina.

50. La escritura de compraventa acordada entre el señor Carroccia y el codemandado, De Pedro Montes, se firmó el día 29 de agosto de 2022, por el precio de $249,000.00. A la otorgación de la escritura compareció en representación del demandante la corredora de bienes raíces y codemandada, García Rodríguez, a través de un Poder, ya que el demandante comenzaba un trabajo nuevo ese mismo día y no podía ir al cierre. El banco prestó $214,285.00, equivalente el 90% del valor de tasación de $235,000.00. El señor Carroccia pagó directamente al codemandado De Pedro Montes la suma $34,715.00 de diferencia entre lo financiado por el banco y el precio de venta. El negocio de compraventa fue recogido en la Escritura número del 29 de agosto de 2022, otorgada ante la Notario Hortensia M. Fránquez Matos. Por su parte, el préstamo hecho por el banco, mediante pagaré, fue garantizado con hipoteca constituida, mediante la Escritura número 55 del 29 de agosto de 2022, otorgada ante el Notario Alberto R. Fuertes Masarovic.

51. En ningún momento durante las visitas que realizó el señor Carroccia se le ocultó información que supiera el señor De Pedro, sobre los daños visibles del Condominio Villas de Parkville II de las cuales el señor Santiago Rodríguez tenía conocimiento.[36]

52. En ningún momento antes, durante o después de la visita del señor Carroccia y antes de la compraventa del apartamento, el señor Santiago Rodríguez conocía de algún daño a la estructura del apartamento o de las áreas comunes del complejo de apartamentos aparte de los que se podían observar a simple vista como los que vio el señor Carroccia.[37]

53. Antes, durante o después de la visita del señor Carroccia y antes de la compraventa del apartamento, el señor De Pedro Montes no conocía de algún daño a la estructura del apartamento o de las áreas comunes del complejo de apartamentos aparte de los que se podían observar a simple vista como los que vio el señor Carroccia en su visita previo a comprar el apartamento.[38]

---

[36] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[37] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[38] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.

54. Ninguna de las partes ha presentado un informe pericial admisible en evidencia que establezca cuáles son las causas de la destrucción del Condominio Villas de Parkville II.

55. El Sr. Guillermo De Pedro Montes admitió en su deposición que, el 19 de agosto de 2022, fue copiado en un email por parte de la Presidenta de la Junta de Condómines, Myrna Romero, sobre asuntos de contratación de Ingenieros Hidrólogos para el complejo. Esto fue antes de que se efectuara la Compraventa, pero no se evidenció que este hubiese recibido o conocido el contenido del reporte técnico, emitido por dichos profesionales, antes del 29 de agosto de 2022, fecha en que se vendió la propiedad, en cuestión. Dicho informe técnico solo fue enviado a los miembros de la Junta Directiva y en esa fecha el señor De Pedro ya no era parte de esta.[39]

56. En ningún momento durante las visitas que realizó el señor Carroccia se le ocultó información, sobre los daños visibles del Condominio Villas de Parkville II, de las cuales el señor de Pedro Montes tenía conocimiento.[40]

57. Antes, durante o después de la visita del señor Carroccia y antes de la compraventa del apartamento, el señor De Pedro Montes no recibió ninguna comunicación del Consejo de Titulares ni de la Junta de Directores del Condominio Villas de Parkville II, sobre los daños observados ni sobre alguna comunicación o informe preparado por los profesionales contratados.[41]

58. La señora García le brindó servicios de corredora de bienes raíces al señor Carroccia.

59. La señora García, como parte de los servicios brindados al señor Carroccia, se contactó con el señor Santiago Rodríguez, con el propósito de comunicarle que su cliente interesado en la unidad EK-PH1.

60. Como parte de la comunicación de señora García con el señor Santiago Rodríguez se coordinó para que el cliente, el señor Carroccia, viera el apartamento del señor De Pedro Montes, el cual estaba localizado en el Condominio Villas de Parkville II.[42]

61. El 14 de julio de 2022, la señora García acompañó a su cliente, el señor Carroccia al Condominio para que pudiera ver el complejo, sus áreas comunes y el apartamento EK PH1.[43]

62. La señora García estuvo presente en el recorrido que realizó el señor Carroccia, el 14 de julio de 2022, por las áreas comunes del Condominio.

---

[39] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[40] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[41] Véase Anejos de la Entrada 132; Entrada 134; y Entrada 144.
[42] Véase Entrada 1; Anejos I de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[43] Íd.

63. La señora García estuvo presente cuando el señor Carroccia le preguntó al corredor del señor De Pedro, sobre el muro y las grietas y le contestó que ese asunto ya se estaba trabajando.[44]

64. Antes, durante y después de la visita del señor Carroccia y antes de la compraventa del apartamento, el señor De Pedro no había visto nunca el documento titulado Carta Técnica 2022-1 con fecha del 29 de marzo de 2022, preparado por SPEC Group PSC.[45]

65. Antes, durante y después de la visita del señor Carroccia y antes de la compraventa del apartamento, el señor De Pedro no había visto nunca el documento titulado (sic) preparado por SALO Engineering del 20 de agosto de 2022.[46]

66. El señor Carroccia admite que tuvo acceso al informe de SPEC y SALO para el mes de octubre, con posterioridad a los hechos ocurridos en el Condominio.

67. Posteriormente, el señor Carroccia admite que el informe de SPEC y SALO llegaron a la vez a su atención, por la presidenta de la Junta, después de los hechos en una reunión que esta tuvo con todos los vecinos.

68. El señor Carroccia reconoce que recibió los informes de SPEC y SALO, por correo electrónico.

69. El señor Carroccia reconoce que el vendedor De Pedro Montes no condicionó la contratación a que el cierre fuese con Sun West.

70. El señor Carroccia admite que en la carta/informe de la compañía SPEC no se indica que el muro esté en una condición no estable. También, admite que del informe de SPEC no surge que las recomendaciones tenían que hacerse de manera inmediata.

71. El señor Carroccia admite que en ninguna parte del Informe de SPEC se representa que el muro podía colapsar.

72. El señor Carroccia recuerda que le preguntó al señor De Pedro Montes por una grieta en la escalera durante el recorrido que dio en la propiedad en julio de 2022 y que conversaron sobre eso, aunque inmediatamente después indicó que no recordaba si fue con el realtor que habló sobre ello, pero que sí recuerda haber hablado sobre las grietas en la escalera.

73. El señor Carroccia aceptó comprar el apartamento en las condiciones en que se encontraba.

74. El señor Carroccia admite que la razón para imputarle conocimiento al señor De Pedro Montes,

---

[44] Véase Anejos de la Entrada 132; y Entrada 134.
[45] Véase Anejos de la Entrada 132; y Entrada 134.
[46] Véase Anejos \de la Entrada 132; y Entrada 134.

sobre el documento de SALO, fue que este pertenecía a la junta de directores, pero admite que este ya no formaba parte de la Junta cuando se notificó el documento y que eso es un error en la demanda.[47]

75. El señor Carroccia admite que la alegación sobre conocimiento del documento de SALO nada tiene que ver con el señor De Pedro Montes.[48]

76. El señor Carroccia admite que cuando alega que compró el apartamento sin que se le revelara toda la información, relacionada al complejo, se refiere al informe de SPEC y al documento de SALO.

77. El señor Carroccia reconoce que se le imputa conocimiento al señor De Pedro del informe de SPEC, bajo el fundamento de que la Junta de Directores, a la que perteneció, fue la que solicitó el estudio.[49]

78. El señor Carroccia descansa en evidencia de lo que le dijeron terceros sobre el supuesto conocimiento que tenía el señor De Pedro de los informes de SPEC y SALO. Primero, porque la junta a la que perteneció De Pedro fue quien solicitó la evaluación de SPEC. Acto seguido, el señor Carroccia reconoce que no puede afirmar que el informe de SALO haya sido accedido por el señor De Pedro Montes, pues no sabe la fecha en que la junta compartió esa información con los titulares.[50]

79. El señor Carroccia admite que basa su alegación de que el señor De Pedro tenía conocimiento de las fallas del muro del Condominio en la existencia del informe de SPEC y que este debió haber recibido el informe, porque fue su junta la que solicitó la evaluación de SPEC, pero admite que el informe fue notificado a la junta de directores, el 29 de marzo de 2022, cuando el señor De Pedro ya no era parte de la Junta.[51]

En atención a las determinaciones de hechos que anteceden, el TPI razonó que el Vendedor ya no formaba parte de la Junta cuando se recibió la Carta Técnica o los informes de otros ingenieros. Añadió que de la prueba se desprende que tanto el Vendedor como la Corredora **le mostraron toda la propiedad al Apelante, incluidas sus áreas comunes con los daños estructurales visibles. También se le informó que se realizaban consultas con ingenieros** en cuanto a problemas que surgieron en

---

[47] Véase Entrada 1; Anejos de la Entrada 132; Entrada 134; Entrada 139; y Entrada 144.
[48] Íd.
[49] Íd.
[50] Íd.
[51] Íd.

al área cercana al gimnasio y relacionadas con un muro en el Condominio.  Además, el Apelante contrató los servicios de un tasador y de una inspectora para que emitieran informes profesionales antes de comprar el Apartamento.

En fin, el TPI resolvió que el Apelante no presentó prueba en cuanto a que los Vendedores hubiesen conocido y omitido, antes de la venta del Apartamento, la Carta Técnica o alguna otra información material relacionada con los problemas estructurales y de suelo del Condominio.

Inconforme, el 14 de octubre[52], el Demandante interpuso uno de los recursos de referencia (TA2025AP00439); formuló los siguientes señalamientos de error:

> PRIMER ERROR
> Erró el Tribunal de Primera Instancia al hacer determinaciones de hecho totalmente controvertidas existiendo elementos de credibilidad por lo que no procedía la Sentencia Sumaria.
>
> SEGUNDO ERROR
> Erró el Tribunal de Primera Instancia al negarle el derecho a la parte demandante a descubrimiento de prueba sobre una prueba nueva y realmente pertinente para lograr la verdad lo que causó un perjuicio a la parte demandante, no pudiendo usar la nueva prueba para controvertir los hechos propuestos por el Sr De Pedro en su moción de sentencia sumaria.

Por otro lado, el 11 de septiembre, el TPI notificó otra *Sentencia Parcial,* mediante la cual desestimó las reclamaciones contra la Corredora; se formularon las siguientes determinaciones de hechos:

> 1. El 15 de julio de 2025, la Sra. Erica C. García Rodríguez, prestó una Declaración Jurada, Afidávit núm. 118, sobre el caso de epígrafe.[53]
>
> 2. Para el año 2022, el señor Carroccia decidió adquirir una propiedad inmueble, en Puerto Rico.
>
> 3. La señora García es corredora de bienes raíces, en la compañía Keller Williams.[54]

---

[52] Primer día laborable en el Poder Judicial luego del viernes 10 de octubre.
[53] Véase Anejo 1 de la Entrada 144.
[54] Véase Anejo 1, 3 y 4 de la Entrada 144.

4. En el mes de julio de 2022 el Sr. Carroccia contactó a la señora García, para que lo ayudara a buscar una propiedad. Además, como desconocía sobre los bancos en Puerto Rico, le envió varios contactos para que hiciera la gestión de precalificación del préstamo hipotecario. El señor Carroccia escogió a Sun West, por la oferta que le dieron.[55]

5. La Sra. Erica García Rodríguez trabaja en la misma compañía que el señor Santiago Rodríguez como corredora de bienes raíces.[56]

6. La Sra. Erica García Rodríguez contactó al señor Santiago Rodríguez y le informó que tenía un cliente interesado en la compra de una propiedad.[57]

7. El señor Carroccia admitió que contactó a su corredora de bienes raíces, la Sra. Erica García Rodríguez y esta fue quien coordinó la visita al apartamento del señor De Pedro Montes, mediante su corredor de bienes raíces, el señor Santiago Rodríguez.[58]

8. El señor De Pedro Montes era dueño del apartamento EK- PH1 del Condominio Villas de Parkville II.

9. El señor Santiago Rodríguez coordinó la visita del Sr. Roberto Carroccia para que viera el apartamento del señor De Pedro Montes.[59]

10. El 14 de julio de 2022, la señora García visitó la Unidad EK-PH1 del Condominio Villas de Parkville II con el señor Carroccia, estando presente el dueño de la propiedad, el señor De Pedro y su corredor de bienes raíces, el señor Santiago Rodríguez.[60]

11. La señora García fungió como intermediaria y facilitadora entre las partes contratantes.[61]

12. El 19 de julio de 2022, el señor Carroccia hizo una oferta para comprar el Apartamento EK-PH1 del Condominio Villas de Parkville II y los señores Santiago Rodríguez y De Pedro aceptaron la oferta y con ello se comenzaron las gestiones de la compraventa.[62]

13. El 29 de julio de 2022 se llevó a cabo la inspección de la propiedad, en la que estuvo presente el corredor de bienes raíces de los vendedores, el señor Rafael Santiago.[63]

14. El señor Carroccia contrató a una inspectora de propiedad para que inspeccionara la unidad EK-PH1

---

[55] Véase Anejo 1, 3 y 4 de la Entrada 144.
[56] Véase Entrada 1; Anejos de las Entradas 132, 134 y 144.
[57] Véase Entrada 1; Anejos de la Entradas 132, 134, y 144.
[58] Véase Entrada 1; Anejos de las Entradas 132, 134 y 144.
[59] Véase Entrada 1; Anejos de las Entradas 132, 134 y 144.
[60] Véase Entradas 132, 134, y Anejo 1, 4 y 5 de la Entrada 144.
[61] Véase Anejo 1 de la Entrada 144.
[62] Véase Anejos de las Entradas 132, 134 y144.
[63] Véase Entrada 1; Anejos de las Entradas 132, 134, 143, 144 y 148.

del señor De Pedro y la totalidad de las áreas comunes que forman parte del Condominio Villas de Parkville II.[64]

15. Luego de la visita del señor Carroccia, este contrató y envió a un inspector para que realizara una inspección de la propiedad y áreas comunes y recibió el reporte de la unidad EK-PH1 y la totalidad de las áreas comunes que forman parte del Condominio Villas de Parkville II, el 7 de agosto de 2022.[65]

16. El 7 de agosto de 2022, el señor Carroccia le informó a la señora García que había recibido el informe de inspección e indica lo siguiente: "Recibí el reporte de inspección y solo 2 cosas me gustaría ver si el dueño está dispuesto arreglar: el extractor del baño y el toilette del medio baño, pero estamos bien con todo lo demás.[66]

17. El 13 de agosto de 2022 el señor Carroccia solicitó el status del cierre; a esos efectos, la codemandada se comunicó con el banco y le indicaron que estaban esperando por un documento firmado por la administración.[67]

18. El 15 de agosto de 2022 la señora García le dio seguimiento al banco Sun West y le indicaron que aún están pendiente de unos documentos para la revisión y aprobación final de la underwriter.[68]

19. El 16 de agosto de 2022, Sun West le indicó a la señora García haber recibido el documento, que se remitieron las facturas y estarían enviando el CD.[69]

20. El 18 de agosto de 2022, la señora García recibió comunicación de Sun West, indicando que están pendientes de recibir varias contestaciones a las preguntas de la revisión del Condo Checklist Approval.[70]

21. El 19 de agosto de 2022, la señora García se comunicó con el corredor de los vendedores, el señor Santiago Rodríguez y este le indicó que se habían remitido las contestaciones a las preguntas de Sun West.[71]

22. El 22 de agosto 2022, el señor Carroccia indicó que está solicitando información del administrador para la aprobación del cierre.[72]

23. El 23 de agosto de 2022, la señora García le comunicó al señor Carroccia que dialogó con la administración del Condominio Villas de Parkville II y

---

[64] Véase Entrada 1; Anejos de las Entradas 132, 134, 143, 144 y 148.
[65] Véase Entrada 1; Anejos de las Entradas 132; 134, 143, 144 y 148.
[66] Véase Anejos de la Entrada 144.
[67] Véase Anejo 1 y 2 de la Entrada 144.
[68] Véase Anejo 1 y 2 de la Entrada 144.
[69] Véase Anejo 1 y 2 de la Entrada 144.
[70] Véase Anejo 1 y 2 de la Entrada 144.
[71] Véase Anejo 1 y 2 de la Entrada 144.
[72] Véase Anejo 1 y 2 de la Entrada 144.

estarían enviando los documentos a Sun West, ese mismo día.[73]

24. El 25 de agosto de 2022, el corredor de bienes raíces, el señor Santiago Rodríguez le indicó al señor Carroccia que Sun West recibió la documentación pendiente y que Damaris Díaz, gerente de Sun West, le indicó que estaban esperando por la aprobación del comité. Más tarde, ese día, el caso fue aprobado y pasado a cierre.[74]

25. El 29 de agosto de 2022, se llevó a cabo el cierre con Sun West, donde la señora García fungió como la apoderada del señor Carroccia. En el cierre, la señora García llamó al demandante por facetime para que el señor De Pedro le explicara unos datos de la Propiedad.[75]

26. A pesar de las gestiones que realizó la señora García, no existe contrato alguno con el señor Carroccia, ni tampoco recibió honorarios por parte de este.[76]

27. El señor Carroccia admitió que no le pagó suma alguna a la señora García.[77]

28. La señora García compartió con el señor Santiago Rodríguez un porcentaje de la comisión pagada por el señor De Pedro, por la venta de la Unidad EKPH1 del Condominio Villas de Parkville II.[78]

29. El 18 de septiembre de 2022, el señor Carroccia le comunicó a la señora García sobre un derrumbe que hubo en el estacionamiento. Le solicitó a la señora García que le recomendara abogados y que le enviara propiedades para alquilar, en lo que la situación se manejaba.[79]

30. El 25 de septiembre de 2023, el señor Carroccia le indicó a la codemandada que pudo renovar el alquiler del apartamento donde estaba, por lo que no buscará propiedades hasta verano 2024. Informó estar agradecido por el servicio y que la estaría llamando para esa fecha.[80]

31. La señora García, como un tercero en la transacción de compraventa de la Unidad EK-PH1 del Condominio Villas de Parkville II, no se le notificó la información relacionada a la transacción ni sus detalles.[81]

32. La Administración del Condominio Villas de Parkville II solo divulga información a los titulares y no

---

[73] Véase Anejo 1 y 2 de la Entrada 144.
[74] Véase Anejos 1 y 2 de la Entrada 144.
[75] Véase Anejos 1 y 2 de la Entrada 144.
[76] Véase Anejos de la Entrada 144.
[77] Véase Anejos 1, 3 y 4 de la Entrada 144.
[78] Véase Anejos 1, 3 y 4 de la Entrada 144.
[79] Véase Anejos 1 y 2 de la Entrada 144.
[80] Véase Anejos 1 y 2 de la Entrada 144.
[81] Véase Anejo 1 de la Entrada 144.

a terceros, por lo que nunca le enviaron información a la señora García.[82]

33. La Administración del Condominio Villas de Parkville II le remitía la información directamente al banco, en este caso, Sun West.[83]

34. Ni los vendedores, el matrimonio De Pedro- Torres, ni el corredor de bienes raíces, el señor Santiago Rodríguez, le divulgaron a la señora García información alguna, sobre un informe o carta técnica en relación a las áreas comunes del Condominio Villas de Parkville II.[84]

35. La señora García manifestó que, en ningún momento, antes de la compraventa, tuvo conocimiento sobre algún daño estructural del Condominio Villas de Parkville II o de la unidad EK-PH1 que no fuesen los ya discutidos y que se podía apreciar a simple vista.[85]

De conformidad, el TPI concluyó que el Demandante no controvirtió que la Corredora no tenía conocimiento en cuanto a los informes de ingenieros sobre la condición del suelo, por lo cual desestimó con perjuicio la Demanda en cuanto a la Corredora. El TPI determinó que el Demandante había sido temerario al incluir como demandada a la Corredora y, por tanto, lo condenó al pago de $3,000.00 por concepto de honorarios de abogado.

No conteste con este resultado, el 18 de septiembre, el señor Carroccia solicitó reconsideración, lo cual fue denegado por el TPI mediante una *Resolución Interlocutoria* notificada el 16 de octubre.

En desacuerdo, el 29 de octubre, el Apelante instó el otro recurso de apelación de referencia (TA202500494); formuló los siguientes señalamientos de error:

PRIMER ERROR
Erró el Tribunal de Primera Instancia al imponer $3,000 en concepto de Honorarios de Abogado por temeridad.

SEGUNDO ERROR
Erró el Tribunal de Primera Instancia al dictar Sentencia Parcial basada en Fuentes de Derecho sospechosas o que no existen.

---

[82] Véase Anejo 1 de la Entrada 144.
[83] Véase Anejo 1 de la Entrada 144.
[84] Véase Anejo 1 de la Entrada 144.
[85] Véase Anejo 1 de la Entrada 144.

El 4 de noviembre, ordenamos la consolidación de los casos de referencia. El 13 de noviembre, los Vendedores presentaron su alegato; la Corredora hizo lo propio el 1 de diciembre. Resolvemos.

II.

La sentencia sumaria es un mecanismo procesal que se utiliza para lograr la solución justa, rápida y económica de una controversia sin que resulte necesario celebrar un juicio en su fondo. *Meléndez González v. M. Cuebas, Inc.*, 193 DPR 100, 109 (2015); *SLG Zapata v. J.F Montalvo*, 189 DPR 414, 430 (2013). Este mecanismo procesal se rige por la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.

En particular, la Regla 36.3 (e) de las de Procedimiento Civil, *supra*, dispone que procede dictar sentencia sumaria si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia, si la hubiere, acreditan la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y pertinente y, además, si el derecho aplicable así lo justifica. *Meléndez González et. al.*, supra; *SLG Zapata*, supra; *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 128 (2012).

Si se concluye que "existe una controversia real y sustancial sobre hechos relevantes y pertinentes", no procede dictar sentencia sumaria. *Ramos Pérez v. Univisión*, 178 DPR 200, 213-214 (2010) (Énfasis nuestro). Un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Meléndez González et. al.*, supra; *Ramos Pérez,* 178 DPR a la pág. 213, citando a J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. I, pág. 609; *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001); *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563, 577 (1997).

La parte promovente de una solicitud de sentencia sumaria está obligada a establecer, mediante prueba admisible en evidencia, la inexistencia de una controversia real respecto a los hechos materiales y esenciales de la acción. Además, deberá demostrar que, a la luz del derecho sustantivo, amerita que se dicte sentencia a su favor. *Ramos Pérez*, supra; *Vera v. Dr. Bravo*, 161 DPR 308, 332-333 (2004). Cuando de las propias alegaciones, admisiones o declaraciones juradas, surge una controversia de hechos, la moción de sentencia sumaria es improcedente. *Mgmt. Adm. Servs., Corp. v. E.L.A.*, 152 DPR 599, 610 (2000).

Por su parte, quien se oponga a que se dicte sentencia sumaria debe controvertir la prueba presentada. La oposición debe exponer de forma detallada y específica los hechos pertinentes para demostrar que existe una controversia fáctica material, y debe ser tan detallada y específica como lo sea la moción de la parte promovente pues, de lo contrario, se dictará la sentencia sumaria en su contra, si procede en derecho. Regla 36 (c) de Procedimiento Civil, supra. Cuando la moción de sentencia sumaria está sustentada con declaraciones juradas u otra prueba, la parte opositora no puede descansar en meras alegaciones y debe proveer evidencia para demostrar la existencia de una controversia en torno a un hecho material. A tales efectos, el juzgador no está limitado por los hechos o documentos que se aduzcan en la solicitud, sino que debe considerar todos los documentos del expediente, sean o no parte de la solicitud de sentencia sumaria, de los cuales surjan admisiones hechas por las partes. *Const. José Carro*, 186 DPR a la pág. 130, citando a *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 280-281 (1990).

De otra parte, nuestro ordenamiento jurídico reconoce el mecanismo de la sentencia sumaria por insuficiencia de la prueba en situaciones en las que una parte alega que la parte antagonista

no cuenta con suficiente evidencia para prevalecer en un juicio. *Medina v. M.S. & D. Química P.R., Inc.*, 135 DPR 716, 731 (1994). Bajo esta modalidad de la sentencia sumaria, una vez que las partes culminan un adecuado y apropiado descubrimiento de prueba, el promovente puede solicitar la sentencia sumaria alegando insuficiencia de prueba por parte del promovido. *Medina*, 135 DPR a la pág. 732. Destacamos que tanto la moción de sentencia sumaria como la oposición a esta, podrán ser acompañadas con documentos relacionados con el descubrimiento de prueba o con evidencia afirmativa, aunque la misma no haya sido obtenida mediante el descubrimiento.[86] *Medina*, 135 DPR a las págs. 732-733.

Asimismo, "[a] la modalidad de sentencia sumaria por insuficiencia de la prueba le aplican todas las normas y principios que tradicionalmente hemos indicado deben utilizarse por los tribunales al entender en una moción de sentencia sumaria." *Medina*, 135 DPR a la pág. 734. Por consiguiente, de existir alguna "duda sobre si hay o no prueba suficiente o si hay una controversia de hecho, esta duda debe resolverse en favor de la parte promovida".

III.

De otra parte, mediante el descubrimiento de prueba se pretende ayudar a precisar y minimizar las controversias litigiosas; obtener evidencia que se utilizaría en el juicio; facilitar la búsqueda de la verdad y perpetuar la prueba relacionada con las reclamaciones de un caso. Véase, Regla 23.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 23.1; *Berrios Falcón v. Torres Merced*, 175 DPR 962, 971 (2009); *García Rivera et al. v. Enríquez*, 153 DPR 323,

---

[86] La parte promovida podrá derrotarla con sólo presentar una oposición acompañada con prueba que controvierta o que rebata la evidencia afirmativa presentada por el promovente. Esta prueba en oposición a la sentencia sumaria puede ser admisible en evidencia o, aunque no sea admisible en la forma presentada, podría convertirse en una prueba admisible o dar lugar a una prueba admisible. Íd.

333 (2001); *Rivera y otros v. Bco. Popular*, 152 DPR 140, 152 (2000); véanse, además, *Medina v. M.S.*, 135 DPR a la pág. 728; *Lluch v. España Service Sta.*, 117 DPR 729, 743 (1986).

En cuanto al alcance del descubrimiento de prueba, este debe ser amplio y liberal. *Consejo de Titulares v. Triple-S*, 2025 TSPR 82 a la pág. 14, citando a *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 496 (2022); *McNeil Healthcare v. Mun. Las Piedras II*, 206 DPR 659, 672 (2021); *Rivera y otros*, 152 DPR a la pág. 152. El TPI tiene "amplia discreción para regular el ámbito del descubrimiento, pues es su obligación garantizar una solución justa, rápida y económica del caso, sin ventajas para ninguna de las partes". *Rivera Gómez v. Arcos Dorados*, 212 DPR 194, 203 (2023), citando a *Cruz Flores et al.*, 210 DPR a las págs. 496-497.

Claro está, cualquier limitación al descubrimiento de prueba deberá hacerse de forma razonable. Es decir, "[m]ás que una facultad, existe un deber que se le impone al Tribunal de Primera Instancia de actuar afirmativa y dinámicamente en la tramitación de los casos ante su consideración". *Rivera* Gómez, 212 DPR a la pág. 221, citando a J.A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2.a ed., Publicaciones JTS, 2011, T. III, págs. 837–838; *Vives Vázquez v. ELA*, 142 DPR 117, 139 (1996). De conformidad con lo anterior, resulta imprescindible señalar que el ejercicio de discreción en materia de descubrimiento de prueba no es revisable por los tribunales apelativos a menos que se demuestre que el Tribunal de Primera Instancia: (1) actuó movido por prejuicio o parcialidad; (2) incurrió en un craso abuso de discreción;[87] o (3) se

---

[87] La discreción consiste en el poder que tiene un tribunal para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción. *García v. Asociación*, 165 DPR 311, 321 (2005); *Rodríguez v. Pérez*, 161 DPR 637, 661 (2004). Véase, además, *Torres v. Junta Ingenieros*, 161 DPR 697, 715 (2004); *Ramírez v. Policía de P.R.*, 158 DPR 320, 340 (2002). El ejercicio adecuado de la discreción está atado al concepto de la razonabilidad. *García*, 165 DPR a la pág. 321. Se trata, pues, de "[l]a obligación de aplicar las reglas del conocimiento distintivo a ciertos hechos jurídicos con el objeto de mitigar los efectos adversos de la Ley, a veces diferenciando unos efectos de otros." *Pueblo v. Sánchez González*, 90 DPR 197, 200 (1964).

equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012).

IV.

En cuanto al consentimiento en el tema de la contratación, "los vicios de la voluntad son el error, el dolo, la violencia y la intimidación". Artículo 285 del Código Civil, 31 LPRA sec. 6191. En particular, se entiende que existe dolo cuando se induce a una parte a otorgar un contrato mediante "maquinaciones insidiosas". *Pérez Rosa v. Morales Rosado*, 172 DPR 216, 229 (2007). Así pues, el dolo implica "...todo un complejo de malas artes, contrario a la honestidad e idóneo para sorprender la buena fe ajena, generalmente para beneficio propio". Íd., citando a *Colón v. Promo Motor Imports, Inc.*, 144 DPR 659, 666 (1997).

Ahora bien, no todo tipo de dolo produce la nulidad de un contrato. *García Reyes v. Cruz Auto Corp.,* 173 DPR 870, 886 (2008). Para que se produzca la nulidad del contrato, el dolo tiene que ser grave. *Pérez Rosa*, 172 DPR a las págs. 229-230. El dolo grave es "la acción u omisión intencional por la cual una parte o un tercero inducen a otra parte a otorgar un negocio jurídico que de otra manera no hubiera realizado". Art. 292 del Código Civil, 31 LPRA sec. 6211. Por ende, el promovente no hubiese celebrado el contrato de conocer de su existencia. *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48, 64 (2011). Así pues, estamos ante dolo grave cuando el engaño recae en los elementos esenciales del contrato; es decir, que tiene un efecto en las motivaciones principales que llevaron a la parte afectada a vincularse. *Colón,* 144 DPR a la pág. 669.

En conexión, constituye dolo ocultarle a la parte compradora la existencia de una circunstancia importante respecto al objeto del acuerdo. *Bosques v. Echevarría*, 162 D.P.R. 830, 836 (2004). En este caso, es dolo "callar sobre una circunstancia importante

relacionada con el objeto del contrato". *García Reyes,* 173 DPR a la pág. 886. Consecuentemente, el dolo no necesariamente implica una artimaña, sino que el silencio sobre determinados hechos relevantes para viabilizar la contratación, también se cataloga como tal. *Bosques*, 162 DPR a la pág. 836.

Por su parte, el dolo incidental es el que afecta las obligaciones accesorias del contrato, y únicamente da lugar a una indemnización en daños y perjuicios. Íd.; *Colón,* 144 DPR a la pág. 667. Lo anterior, debido a que no tuvo una influencia decisiva sobre la obligación, toda vez que, aunque hubo engaño en el modo en que el contrato fue celebrado, el perjudicado sí tenía la voluntad de contratar. *Pérez Rosa* 172 DPR a la pág. 230; *García Reyes*, 173 DPR a la pág. 887. En otras palabras, el contrato se hubiera celebrado de todas formas, pero no bajo las mismas condiciones. *Colón,* 144 DPR a la pág. 667, citando a M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1993, T. XVII, Vol. 1-B, pág. 407.

Destacamos que el dolo no se presume, por lo que tiene que demostrarse, ya sea de forma directa o mediante evidencia circunstancial. *Pérez Rosa,* 172 DPR a la pág. 229; *Colón,* 144DPR a la pág. 669. Además, no debe haber sido empleado por ambas partes contratantes. Artículo 294 del Código Civil, 31 LPRA sec. 6213. La determinación de si el dolo es grave o incidental es una cuestión de hecho. Por lo tanto, está sujeta a la apreciación de las circunstancias concurrentes en cada caso. *Acosta & Rodas, Inc., v. PRAICO,* 112 DPR 583, 616 (1982). No obstante, la causa de acción por dolo en la contratación, tanto en su modalidad causante como en la incidental, imponen sobre el reclamante la responsabilidad de la prueba de la conducta dolosa. *Colón,* 144 DPR a la pág. 668 citando a *Canales v. Pan American*, 112 DPR 329, 340 (1982).

## V.

De otra parte, el remedio disponible como sanción por el uso indebido de los procedimientos legales será la imposición de costas y honorarios de abogado por temeridad, cuando procedan. *Giménez Álvarez v. Silén Maldonado*, 131 DPR 91, 97 (1992). La Regla 44.1 (d) de las de Procedimiento Civil, 32 LPRA Ap. V R. 44.1 (d), reglamenta lo concerniente a la imposición de honorarios de abogado. *Pérez Rodríguez v. López Rodríguez et al.*, 210 DPR 163, 192 (2022). En síntesis, dispone que, si en un pleito cualquier parte o su abogado ha procedido con temeridad o frivolidad, el tribunal deberá imponerle el pago de una suma por concepto de honorarios de abogado. Íd.

Incurre en temeridad aquella parte que, por su "terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito". *Pérez Rodríguez*, 210 DPR a la pág. 193; *S.L.G. Flores-Jiménez v. Colberg*, 173 DPR 843 (2008); *Torres Ortiz v. E.L.A.*, 136 DPR 556, 565 (1994); *Polanco v. Tribunal Superior*, 118 DPR 350, 359 (1987). La temeridad "conlleva aquellas actuaciones de un litigante que lleven a un pleito que pudo evitarse, que provoquen la prolongación indebida del trámite judicial o que obliguen a la otra parte a incurrir en gastos innecesarios para hacer valer sus derechos". *SLG González-Figueroa v. SLG et al.*, 209 DPR 138, 148 (2022). Los honorarios por temeridad buscan "disuadir la litigación innecesaria y alentar las transacciones, mediante la imposición de sanciones a la parte temeraria, que compensen los perjuicios económicos y las molestias sufridas por la otra parte". *Torres Ortiz*, 136 DPR a la pág. 565. A diferencia de las costas, que sólo las puede recobrar quien prevalece en el pleito, no se requiere prevalecer para recobrar honorarios por temeridad.

Adviértase que la imposición de honorarios de abogado por temeridad es una facultad discrecional del tribunal que no será variada a menos que la misma constituya un abuso de discreción, o cuando la cuantía sea excesiva o exigua. Véanse, *Monteagudo Pérez v. ELA*, 172 DPR 12, 31-32 (2007); *Ramírez v. Club Cala de Palmas*, 123 DPR 339, 350 (1989). Consecuentemente, "los tribunales apelativos intervendrán únicamente cuando surja en tal concesión un claro abuso de discreción". *Pérez Rodríguez*, 210 DPR a la pág. pág. 193.

VI.

Luego de examinar detenidamente el récord del caso de referencia, concluimos que actuó correctamente el TPI. Veamos.

En cuanto al manejo del descubrimiento de prueba que realizó el TPI, y contrario a lo que plantea el Apelante, se desprende del récord que el TPI les dio amplia oportunidad a las partes de realizar y culminar el descubrimiento de prueba. El TPI decretó un primer cierre del descubrimiento de prueba para el **31 de diciembre de 2024**, mediante una *Resolución y Orden* notificada el 16 de agosto de 2024.[88]

El **5 de diciembre de 2024**, las partes presentaron el *Informe sobre el Manejo del Caso*. En dicho *Informe* el Apelante no avisó testigos adicionales a su propia persona y, en cuanto a la prueba pericial, informó que el Ing. José M. Izquierdo Encarnación fue consultado, pero no rindió informe pericial.[89] Asimismo, en dicho *Informe* el Consejo de Titulares y la Sra. Myrna Romero Marrero, Presidenta de la Junta (la "Presidenta"), informaron que proveyeron, entre otros documentos, el Acta de la Asamblea Ordinaria llevada a cabo el 15 de febrero de 2022, de la cual se desprende que el

---

[88] Entrada 60 de SUMAC.
[89] Véase, *Informe sobre el Manejo del Caso*, pág. 8. Entrada 97 de SUMAC.

Condominio contaba con los servicios de administración de la compañía In Servicio, LLC ("In Servicio").

Por consiguiente, desde al menos el 5 de diciembre de 2024, el Apelante conocía que In Servicio brindaba servicios al Condominio y había anunciado que el Ing. Izquierdo Encarnación había sido consultado, pero que no había rendido informe pericial. Atendido el aludido *Informe*, el TPI dictó una *Orden de Calendarización* en la que, entre otros asuntos, **extendió el cierre del descubrimiento de prueba hasta el 28 de febrero de 2025**.[90]

Al cabo de algunos incidentes procesales, **el TPI extendió nuevamente el descubrimiento de prueba hasta el 30 de abril del 2025,** en atención a que el Apelante notificó la deposición del Vendedor.[91] En ese momento, el Apelante tampoco actualizó la información en cuanto a los testigos que pretendía utilizar, ni solicitó descubrimiento de prueba relacionado con la empresa In Servicio.

No fue sino hasta culminada la deposición del Vendedor en el último día concedido por el TPI para terminar el descubrimiento de prueba, que el Apelante notificó un informe pericial del Ing. Izquierdo Encarnación y anunció que el perito consultor ahora declararía en el juicio. Subrayamos que no estamos ante una situación en que una parte logró conseguir un perito en las últimas etapas del descubrimiento de prueba. Aquí, el Apelante anunció el 30 de abril de 2025, último día del descubrimiento de prueba, un informe de un testigo que se había anunciado el 5 de diciembre de 2024, pero únicamente como perito consultado.

Como vemos, el Apelante tuvo amplia oportunidad de realizar el descubrimiento de prueba y le correspondía exhibir mayor diligencia, lo cual no hizo. El TPI tiene amplia discreción para

---

[90] Entrada 99 de SUMAC.
[91] Entrada 110 de SUMAC.

pautar el descubrimiento de prueba y en el caso de autos dicha discreción no se ejercitó en un vacío, sino que fue el resultado de un balance ponderado y razonable entre el interés de garantizar un descubrimiento de prueba amplio y liberal, y el interés de promover una solución justa, rápida y económica del caso. En cualquier caso, como veremos, por definición, nada de lo que podría haber aportado el perito contratado por el Demandante incide sobre (i) la información conocida por los Vendedores y la Corredora antes de la transacción o (ii) la información transmitida por dichas partes al Demandante antes de la compraventa.

Por otra parte, el récord demuestra, en esencia, que la información material conocida por los Vendedores fue transmitida al Demandante antes de la compraventa. Incluso, del récord surge, de forma incontrovertida, que toda persona que visitara o viviera en el Condominio observaría grietas y problemas en el suelo, así como grietas en varios lugares de las áreas comunes del Condominio. El propio Apelante visitó el lugar en al menos dos ocasiones[92] y se le mostraron varias de las áreas comunes.[93] Surge de su deposición que el Apelante no le dio importancia a recorrer la totalidad de las áreas comunes.[94] Asimismo, en la deposición, el Apelante declaró que no recordaba haber visto en las áreas comunes el socavón o la cinta que demarcaba el área con problemas de hundimiento de terreno.[95] El Apelante afirmó que no recordaba haberle preguntado a los Vendedores en cuanto algún asunto estructural de las áreas

---

[92] Véase, Deposición del señor Carroccia, Anejo VIII de la *Moción de Sentencia Sumaria*, pág. 22, líneas 8-13, Entrada 132 de SUMAC.

[93] Véase, Deposición del señor Carroccia, Anejo VIII de la *Moción de Sentencia Sumaria*, de la pág. 21, línea 23 a la pág.22, línea 4; pág. 24, líneas 14-21, Entrada 132 de SUMAC.

[94] Íd, pág. 24, líneas 14-21.

[95] Véase, Extracto de Deposición Demandante, Anejo 3 de la Oposición a Solicitud de Desestimación y/o (sic) de Sentencia Sumaria, de la pág. 179 línea 21 a la pág. 180, línea 9.

comunes.[96]    Asevero que, si mal no recordaba, habló con el Vendedor y este le dijo que eran unas boberías.[97]

Sin embargo, el Apelante admitió que observó una grieta entre una pared y una escalera y que conversó con el Vendedor sobre esto.[98] Más aún, el Demandante contrató un inspector que lo asistió durante el proceso de evaluar el Apartamento. De lo anterior claramente surge que el Vendedor sabía o debía saber que existían los problemas que afirma se le ocultaron.

Contrario a lo alegado por el Demandante, no hay apoyo en el récord para la teoría de que el Vendedor tenía información adicional a la divulgada al Demandante, o disponible a este a plena vista durante sus visitas al Condominio. No se aportó evidencia de que el Vendedor conociera el contenido de la Carta Técnica o que tuviese datos que le permitiesen concluir que era inminente que ocurriese un socavón mayor, a causa de un evento de lluvias de gran magnitud que provocaría la ruina del Apartamento. En efecto, cuando la Carta Técnica fue emitida, el Vendedor ya no era parte de la Junta. El conocimiento del Vendedor de que se había solicitado una evaluación técnica del problema no es equivalente al conocimiento de la información que el Demandante alega le fue ocultada. Incluso, ni siquiera en la Carta Técnica consta que un socavón mayor era inminente y desembocaría en una orden de desalojo para parte del complejo residencial.[99]

Por su parte, y contrario a lo que sugiere el Demandante, la utilización de declaraciones juradas en apoyo a una solicitud de sentencia sumaria es autorizado y aceptado en nuestro

---

[96] Íd., pág. 180, líneas 10-23; Extracto de Deposición Demandante, Anejo 4 de la Oposición a Solicitud de Desestimación y/o (sic) de Sentencia Sumaria, pág. 92 líneas 5-11, Entrada 139 de SUMAC.
[97] Íd, pág. 91 línea 22 a la pág. 92, línea 2.
[98] Véase, *Moción de Sentencia Sumaria*, Deposición del señor Carroccia, Anejo VII, Entrada 132 de SUMAC, pág. 27, líneas 16-24, Entrada 132 de SUMAC.
[99] Véase, Carta Técnica, Anejo 12 de la *Oposición a Solicitud de Desestimación y/o de Sentencia Sumaria*, Entrada 139 de SUMAC.

ordenamiento jurídico. Véase, Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1; *Meléndez González et al.*, 193 DPR a la pág. 110. Ante la presentación de una declaración jurada por parte de los Vendedores,[100] le correspondía al Apelante en su *Oposición* presentar evidencia que apuntara hacia la existencia de una controversia en cuanto a un hecho material.

No obstante, en su *Oposición*, el Apelante esgrimió como argumento principal que la declaración jurada de los Vendedores constituía prueba sorpresiva, que no le fue notificada y no podía contrainterrogarse, por lo cual no podía considerarse por el TPI. Ello no constituye un planteamiento meritorio, pues la norma es que este tipo de declaración jurada se permite en apoyo a una moción de sentencia sumaria. Al oponerse, le correspondía al Apelante presentar su propia prueba para controvertir la presentada por la otra parte. Sin embargo, el Apelante no lo hizo; es decir, no expuso de forma detallada y específica los hechos pertinentes que demostrarían que existía una controversia fáctica que impidiese la resolución sumaria de la reclamación.

Por otro lado, concluimos que también actuó correctamente el TPI al desestimar la reclamación contra la Corredora. Como cuestión de umbral, adviértase que el Apelante ni siquiera se opuso a Moción de la Corredora. En cualquier caso, no existe prueba en el récord que sostenga la postura del Apelante en cuanto a que la Corredora tenía conocimiento de alguna información, sobre el problema de los suelos en el Condominio, no divulgada oportunamente al Demandante. Tampoco existe prueba de que la Corredora, antes de venderse el Apartamento, conociera la Carta Técnica o algún otro informe.

---

[100] Los Vendedores no se limitaron a presentar una declaración jurada en apoyo a la *Moción de Sentencia Sumaria*, sino que anejaron varios documentos producidos durante el descubrimiento de prueba. Entrada 132 de SUMAC.

Finalmente, tampoco podemos concluir que haya abusado de su discreción el TPI al determinar que el Demandante incurrió en temeridad al incluir como demandada a la Corredora y así obligarle innecesariamente a asumir las molestias, los gastos y las gestiones de un pleito. Ello porque del récord surge que el Demandante nunca tuvo prueba alguna para sustentar su teoría en cuanto a la Corredora. No tiene mérito lo planteado por el Apelante en cuanto a que no pudo obtener dicha prueba a raíz de que se desestimara la reclamación contra la Presidenta, pues, aun así, ella podía ser depuesta y así descubrirse lo que ella supuestamente sabía sobre el conocimiento de la Corredora en cuanto a los problemas del Condominio.

Asimismo, según antes reseñado, la norma es que la determinación de temeridad se sostiene en apelación salvo que se demuestre que hubo un abuso de discreción o cuando la cuantía sea excesiva. Véanse *Monteagudo Pérez v. ELA*, 172 DPR 12, 31-32 (2007); *Ramírez Anglada v. Club Cala de Palmas*, 123 DPR 339, 350 (1989). El Apelante no demostró que el TPI abusara de su discreción o actuara con perjuicio o parcialidad. Por consiguiente, no se justifica nuestra intervención al respecto[101].

VII.

Por los fundamentos que anteceden, se confirman las sentencias apeladas.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[101] También es improcedente lo planteado por el Apelante a los efectos de que, supuestamente, el TPI citó una fuente de derecho incorrectamente o "desconocida". Este tribunal sólo revisa resultados y no fundamentos, por lo cual este tipo de error, aun de haberse cometido, no conllevaría la revocación de lo actuado por el TPI. *Freire Ayala v. Vista Rent*, 169 DPR 418, 442 (2006); *Pueblo v. Pérez*, 159 DPR 554, 566 (2003); *Asoc. de Pesc. de Pta. Figueras, v. Pto. del Rey*, 155 DPR 906,920 (2002); *Corrada v. Asamblea Municipal*, 79 D.P.R. 365, 370 (1956).